Good morning. Good morning, Your Honor. I'd like to reserve five minutes for rebuttal, if that's true. Good morning, members of the panel. May it please the Court, in this case... Can we get your name for the record, please? I'm sorry. I'm Mark Coleman. Thank you. We're plaintiff and appellant. Great. Thank you. In this case, Anna Salisbury, plaintiff and appellant, challenges the grant of summary judgment against her for disability discrimination under California law. The central issue is whether Delta's involuntary demotion of Salisbury in 1999 from flight attendant to a permanent secretarial job constituted reasonable accommodation as a matter of law and fact, such that no reasonable tribal issue of fact existed such that a competent jury could have found otherwise. Mr. Coleman, as I understand the record, didn't your client request the accommodation so that she could start part-time in that secretarial position? Absolutely. And you described it a moment ago as an involuntary demotion. How can that be if she asked the employer to place her in that position? She originally requested to come back in a part-time temporary capacity, and the record reflects that every time she made her request to come back, it was as a temporary assignment so that she could return to flying. What happened was, although everything according to Delta as related to Salisbury was that she was in a temporary position such that when her health returned, she could return to flying. But it was a period of several years, wasn't it? No, no. Before she was finally, you know, from the time that she originally requested to come back, before she was finally physically eligible or capable of the flight attendant position. It was months, Your Honor. She started back in June of 1999, and in March of 2000, her doctor declared her to return to flight attendant. And the problem, I guess, we have here is that the employer apparently had some sort of a 60-day policy that they invoked to say to her, you were basically in that temporary job too long in order to retain all of your seniority rights and that sort of thing. Well, they sort of made it up as they went along, Delta did. Made it up? Did you discover any actual evidence that that's the way they had treated other employees who had requested temporary accommodations? Well, Delta has a number of ways they treat other flight attendants. They give them additional extensions on the 60 days. In Salisbury's case, they didn't even get around to talking to her. They never really talked to her about the 60 days until well after they had placed her permanently, quote-unquote, into the secretarial position. So they also have something called special assignment. And what's particularly germane is that Delta communicated to Salisbury's supervisor a number of options that would have left her in the flight attendant job. But these would never communicate to Salisbury. And some of those options, actually all of the options, would have allowed her to retain her flight attendant job and not be demoted into the secretarial position. So the problem really arises because of Delta's unannounced decision to Salisbury that they were changing her from a temporary part-time job, which is where she started. And if you look at the communication from Delta to Salisbury, that's exactly what it says. This is a temporary... The one question I had on communication was the letter that was subsequently sent to her. And it wasn't clear to me whether her position is, I never saw that letter or I don't deny that I received it. What does the record show in that regard? The first communication is at the excerpt of record, page 278.  where Delta says to Salisbury, quote, Of course, it is temporary. That was the initial understanding. And the record is replete with numerous instances in which Salisbury checked with her supervisors along the way and was told that Delta in Atlanta had said that as soon as you're able to return to work, you can go back to your job as a flight attendant. All you need is medical clearance from your doctor and ours, a functional capacity examination, and requalification training. But you do not lose your job. And the problem arises because Delta, without talking to Salisbury, without any necessity to it, and certainly without any undue burden on Delta, unilaterally decided to displace her from her permanent secretarial job into a temporary... I'm sorry, into a permanent secretarial job. Mr. Coleman, as I understand it, the real, the heart of this issue as far as Ms. Salisbury is concerned is her loss of a continual accrual of seniority, right? You're not disputing the fact that she was offered, once she was physically qualified, to return to the position of flight attendant, although, as I understand it in the record, she chose not to voluntarily re-bid for the position without assurances that her seniority would be fully restored. Is that correct? No, that's not correct. Her major concern is that she lost her job. Well, was she or was she not offered the opportunity to re-bid as a flight attendant when she was medically cleared for that position? The question is, what does re-bid mean, Justice Coleman? It's a simple question. It means what? Did Delta make the offer to allow her to re-bid for the position or not? She's allowed to apply for her job all over again. It would be like a judge being put as a law clerk on a temporary basis and then, upon being able to return to the bench, being told, no, you've been permanently classified as a law clerk, you can reapply to be a judge. So the answer to my question is yes with some further explanation, is that it? Well, if you lose your job, you've lost your job. That is a tangible loss to an employee. That is what Title 7, what the California Fair Employment and Housing Act protects. Let me make sure I understand. She had the secretarial position in May of 2000, right? She was in the permanent secretarial position at that time? She had been placed there by Delta. And at that time, while she was working as a permanent secretary, she was offered the opportunity to bid and opted not to do so. Well, she ultimately did, and there were not jobs at that point. She was reluctant because she had been lied to. Did she remain in the secretarial position? Yes. Was she there today? Yes. You said you wanted to reserve some time. Yes, I'll reserve my three minutes and 30 seconds. Thank you, Your Honor. Mr. Coleman, thank you. Good morning. Good morning, Your Honors. May it please the Court. I would like to answer a couple of the questions I think that the panel raised. If we could get your name for the record, please.  Thank you. Before you start, the story I just heard isn't the story I read in your brief. Well, and that's why I wanted to get to that point. The first one is that there is no evidence in this record that any flight attendant was treated differently in Miss Salisbury. There's none cited by the plaintiffs in the briefs. There's no such evidence in the record. As to the options that Mr. Coleman mentioned, our brief sets forth in the record why those options were not available. The special assignment is a special assignment, a creation of a job for a specific project. And, in fact, that was an option to be explored. And, in fact, in Mr. Spratlin's testimony, that was explored and there was no special assignment available. If I read the record correctly, at the time that this illness developed, the second illness, the doctor had an opinion, as I remember, that was conveyed to Delta that she was permanently disabled and she was not going to recover. That is very close, Your Honor. What happened is that the plaintiff's doctor did, in fact, opine that she was permanently disabled. Delta still put her through a functional capacity examination, which determined that she could not perform the flight attendant functions. Delta's doctor, who was a contract doctor, then reviewed all the medical evidence and came to the conclusion that she was permanently restricted from performing the flight attendant. And that was the information that Delta had at the time it made its accommodations. And that particular opinion and status of her physical condition prevailed until after she received the letter that she'd gone into a permanent secretary of status. Then she gets an opinion from her own doctor that says she's now available to fly. And somewhere footnoted or parenthesized in your brief, it said that her doctor was never told of the requirements of the job. That is correct, Your Honor. Her doctor released this to her, I think, in May of 2001 and had never been given the flight attendant job qualifications. But Delta took that and it didn't just stop there. It then asked her to undergo another functional capacity exam to prove that she was capable. And initially she refused, which then delayed the process about another three to four months. She finally did undergo the functional capacity exam. Delta's doctor did finally clear her to fly again. And that's when she was invited to bid. And when Mr. Coleman says that she finally did bid, we know that, in its undisputed fact, that she missed two bids that were open for flight attendant positions. And by the time she finally agreed that she would bid, you know, the disastrous events of 9-11 had occurred. And there is undisputed fact there's not been another bid for flight attendants since that time. And, in fact, I think in our papers, Delta laid off about 4,000 flight attendants. Counsel says that she shouldn't have had the bid, that she was always a flight attendant, she's still a flight attendant, she's on sort of temporary accommodation, and she didn't have to bid. What's the answer to that? The answer to that, Your Honor, is that a reasonable accommodation has to be determined at the time the reasonable accommodation is given. And at the time it was given, there was no indication when, if ever, she would ever return to a flight attendant. So we had to put her someplace. And we ran out of the 60 days. We then accommodated her another 30 days to see if things would change. We then had her bring in her doctor's note at the end of that period, at the end of 90 days. And she still, her doctor would not clear her. At that point, Delta doesn't have to keep her in an indefinite temporary position under California law. Hansen says that directly, that the Fair Employment Housing Act does not require an employer to put somebody in an indefinite position until their condition is corrected, if ever. And at that point, Delta has to make a decision, you know, what to do with her, because you can't just keep her there indefinitely in a temporary position. And therefore, it found a job for her that she could do with reasonable accommodation, giving her flex time so that she could continue to work. That accommodation worked. We kept her in the workplace. We kept her working. And we gave her the opportunity to bid. She refused to bid because she didn't think she had to. But that's just not correct under the law. I mean, the fallacies with Plaintiff's argument proceed from two fundamental misconceptions about the law. One is that the reasonable accommodation can be viewed in hindsight, that the fact that she got better 10 months later after coming back to work, after her doctor said it was a permanent disability, somehow changes what we should have done up front. The second fallacy in the argument is that under the Fair Employment Housing Act, an employer has a duty to give a reasonable accommodation, not the accommodation that is the one that Plaintiff wants or the one that Plaintiff thinks is best for her. And viewed from the circumstances that existed during the time of this disability, DELTA did that. It did everything it was required to do. I would like to address the interactive process for just a moment. I'm sorry. The appellant relies very strongly on a section of the California Fair Employment Housing Act. I think it's section N, 12945N, for the proposition that there's an independent obligation to interactively talk to the employee and that you can have independent violation of the act for that. I'd like to point out that this section wasn't enacted until September of 2000, effective 2001, which would make it after these events. And Hansen clearly says that if you have provided a reasonable accommodation, which DELTA did in this case, you have, as a matter of law, fulfilled your interactive duty. So I think that that issue also falls. Lastly, on the communication, I think it was Justice Tallman asked what was the evidence in the record on the communication. The letter that DELTA sent telling her that she had been accommodated into a regular full-time clerical position was sent on January of 2001. And it is in the excerpts of record at page 215. And at the excerpts of record, page 7072, which is her deposition, she admits that she received that letter. So she was on notice that she had been put in this position sometime in 2001. And also I would direct the panel to the fact that she admits that she was told that this temporary position could only last 60 days at the outset of the whole process by Mr. Spratlin. And how do we know that? We know that because she wrote a letter to her own doctor telling her own doctor back in May of 2000 that if she remained in that position for more than 60 days that she would lose her job as a flight attendant. So there's no question that DELTA told her at the beginning of the process that that was a temporary position that would last 60 days. It accommodated her by adding an additional 30 days. And at the end of the process, it notified her in writing that she had been accommodated into this position. So I do not think that there's evidence in the record that creates a material issue of fact that she wasn't aware of the processes that were at work here in accommodating her on this occasion. Lastly, in keeping her in this position, as I understand it, Plaintiff's position is that it would not be an undue burden to place her in this temporary position indefinitely. And that if DELTA cannot show that that is not an undue burden, she wins. But that's putting the cart before the horse. This very Court in Sharp v. AT&T had that very proposition made to it, that the employer had the burden of somehow showing that the employee's preferred accommodation would not create an undue hardship. And this Court said that that's the wrong analysis. The improper focus of the test is to look at the employer's offered accommodation and determine whether it is reasonable. And if it's reasonable, that's where the analysis stops. And we'll just submit in this case that that is where the analysis would stop, that based on the information that DELTA had available to it at the time, it was in the — it had to find a position for her to work. And it did so with those limitations in mind. Her response that her personal belief was that she could return in six to eight months is irrelevant and cannot create a material issue of fact in this case for two reasons. One, she was wrong. It was about 10 months. And, two, it conflicts with the medical opinions that were available at the time. And the Ninth Circuit in the Allen case versus, I think it's Pacific Bell, found that when the plaintiff's subjective belief as to when they can return to a job conflicts with the medical opinion, it's immaterial. And in this case, her personal belief that she could return in six to eight months simply conflicts with her own doctor, who never, ever provided DELTA with anything as to a projection as to when he believed she could return, if ever, and directly conflicted both with the functional capacity examination and Dr. Brisgaard's opinion that those limitations were permanent. So her opinion that she could return in six to eight months is irrelevant and cannot create a material issue of fact. Do the panel have any further questions? Thank you, Mr. Sessions. Thank you for your time, Your Honor. Mr. Coleman, you get the last word. Thank you. To sanction what DELTA did in this case would make a mockery of anti-discrimination laws. This would sanction the very conduct which the Fair Employment Housing Act seeks to prevent, namely lying to an employee, taking their job from them, when DELTA, as an undisputed fact, does not involuntarily transfer flight attendants. Mr. Sessions stood up here and said that, well, flight attendants who are similarly situated are not so treated. That's untrue. It is an undisputed fact that DELTA has no involuntary demotion practice. But that's exactly what happened to Salisbury. So the lady comes in and tells DELTA, I'm sick. I can't work as a flight attendant. And instead of just saying, go to hell, they find her another job. I mean, we see these cases all the time, and the scenario I just told you is not an uncommon one. Here, they seem to bend over backwards to make sure she's got something to do while she's ill and she's still indeed still there. What am I missing here? Well, that's not what the law requires, Your Honor. The law requires that they not be treated differently or worse than able-bodied employees and that they not be, well, for example, they not be. She couldn't fly. I mean, it's undisputed she couldn't fly. That's correct. They got her a ground job. She needed a temporary accommodation such that she could retain her job. What I think is missing from this argument is the Ninth Circuit's stated declaration that an employee's preference to retain his or her job is given top priority in this search. The Barnett and Bonk decision, I think, modified the Sharp v. AT&T decision by holding that you have to consider what the employee wants, and the number one quest for a disabled employee is holding on to his or her job. Those of us with professions could not possibly be satisfied with taking some menial secretarial job and calling it reasonable accommodation. This is exactly the conduct that the law ---- But how is that different from putting an employee on light duty when the doctor says that they're physically unable to return to the position that they occupied before they were disabled by the disease? I absolutely agree, Your Honor. It would put somebody on light duty. But the purpose of light duty, in this case Ms. Salisbury's secretarial job, was to allow her to work hard and sufficient to return to her old job, her professional job, a job she held for 20 years. If it is simply an opportunity for the employer to say, no, we don't want you anymore in your professional job, we're going to permanently sentence you, regardless of your physical capabilities later on, to a secretarial job, this would sanction unlawful demotion under the anti-discrimination statute. I just don't understand. How can it be unlawful demotion when you acknowledge that at the time she was disabled, she was not physically capable of carrying out the duties of a flight attendant? Your Honor, it happens all the time that people need a temporary leave of absence or rest. I mean, what ---- Ms. Salisbury had stayed off work. Forever? No, until she was physically able to return to the job of flight attendant. Suppose it took five years. Would your argument still be the same, that Delta would still have an obligation under the law to restore her with full seniority rights for that five-year period that she was unable to perform the duties of a flight attendant? If Delta is set up to accommodate flight attendants generally by allowing leaves of absence for prolonged periods, yes, I would say that they have an obligation. They're laying off 4,162 flight attendants after September of 2001 because of a downturn in the industry. How is that a reasonable, or I guess it is an unreasonable burden on the employer. Do you agree? This has all happened prior to 9-11, Your Honor. We're talking about 1999 to 2000. The problem with your facts is that she had two opportunities to re-bid for the position prior to 9-11, and she didn't do it. And now she says, I can't get my job back. And Delta's response is, well, yeah, we've had to lay off 4,000 flight attendants because of the terrible conditions in the airline for this. But she should not have lost her job in the first instance, or her. She should never have been placed in a position where she had to apply like a person off the street for the very job that she held. That's the protection that the anti-discrimination statutes provide. And to sanction Delta terminating her job and allowing her to apply again off the street does not uphold the law in this instance. It sanctions the opposite. That is the lawlessness of Delta in terminating her job as a flight attendant. The accommodation now. That conclusion, I guess, has to be driven by our looking at the fact and saying it was not reasonable for them to put a 60-day limitation on her temporary light-duty assignment, doesn't it? Well, one option, yes. Don't we have to conclude that, no, the employer had an obligation to wait the full 10 months and then restore her with full seniority rights? No, Your Honor. All Your Honor has to conclude. That's what you're asking for. But this is not the trial. This is a motion to sanction. Well, the question is, as a matter of law, does the employer have the obligation to wait an indefinite period of time until such time as the employee is physically able to return to work? The employer. Is that really what you're asking us to rule in this case? No. I'm not asking for an indefinite time. She didn't ask for an indefinite period of time. But the employer is obligated to give someone a reasonable amount of time to come back, in this case from cancer, to return to their original job. And the cases say it is not required, the Humphrey case, the Kimbrough case, both say it is not required that there be a reasonable medical certainty that that temporary job will accommodate them sufficient to return to their ultimate position. I think we understand your argument. Thank you, Mr. Coleman. Thank you, Mr. Coleman. Thank you very much. Mr. Sanchez, thanks to you as well. Case to start. You just submit it. 035-0344, United States v. Vargas, each side will have 10 minutes.
judges: Brunetti, Silverman,tallman